## In re Anonymous No. 74 D.B. 89

Disciplinary Board Docket no. 74 D.B. 89. (Supreme Court ordered suspension on April 28, 1994.)

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

ECKELL, *Chairman,* October 28, 1993—Pursuant to Rule 208 (d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On July 6, 1989, respondent pled guilty to 26 counts of an indictment by a federal grand jury in the U.S. District Court for the [ ] District of Pennsylvania in the matter of *United States of America v. [respondent],* criminal no. [ ]. Specifically, the indictment charged him with 14 counts of mail fraud, two counts of wire fraud, one count of transferring and concealing property of a bankruptcy estate, one count of willful failure to pay taxes, and eight counts of willful failure to file tax returns. He was also convicted of aiding and abetting in 16 of the previous counts.

That same day, petitioner filed a request for immediate suspension from the practice of law with the Supreme Court of Pensylvania mandated by Rule 214(d), Pa.R.D.E. By order dated July 25, 1989, respondent was suspended from the practice of law. This order also referred the criminal conviction to the Disciplinary Board for institution of a formal proceeding before a Hearing Committee to determine the extent of final discipline to be imposed.

Respondent was sentenced in the United States District Court on November 14, 1989, to a two-year term of incarceration on 31 different counts of the indictment, with all of the sentences to run concurrently with one another. In addition, respondent was sentenced to five years probation on the counts relating to his failure to file and pay tax returns, along with special requirements that respondent provide full financial disclosure to the probation department, pay all sums due and owing the Internal Revenue Service, and 1,000 hours of community service, plus pay a special assessment fee of $400.

A petition for discipline was filed on December 28, 1989. Respondent filed an answer but moved for a delay in commencement of the disciplinary hearing. By order of March 9, 1990, the motion was granted and the matter was not referred to Hearing Committee [    ] until December 14, 1990. A pre-hearing conference was then held on January 11, 1991. After various responses were filed back and forth between the parties concerning lists of hearing exhibits and witnesses, hearings were conducted on July 30, 1991, October 28, 1991 and October 29, 1991, before [    ] Esquire, [    ], chairman and members [    ], Esquire and [    ], Esquire. Petitioner and respondent filed post-hearing briefs to the committee and, in turn, filed letter briefs.

The Hearing Committee report was filed on April 15, 1993, recommending that respondent be suspended from practice for a period of five years. Neither party filed exceptions to the report, and the matter was adjudicated before the board at its executive session held on June 16, 1993.

## II. FINDINGS OF FACT

The board submits the following findings of fact, herewith, supported by documentary and testimonial evidence incorporated into the record:

(1) Petitioner, whose principal office is now located at Suite 400, Union Trust Building, 501 Grant Street, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 Pa.R.D.E., with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent was admitted to practice law in the Commonwealth of Pennsylvania in October of 1972. His most recent office location was [    ].

(3) Respondent shared office space with [A], Esquire from 1969 until [A] died in March of 1981. [A] was respondent's mentor. Respondent practiced commercial law and white collar criminal defense from 1978 to 1980. When respondent took over [A's] legal practice, he "inherited" a practice that had many "wheeler dealer business-type clients;" many of these clients became the subject of investigation or criminal charges between 1981

and 1983. Respondent also sub-specialized in defending tax prosecutions.

(4) In or about 1977, respondent purchased [B] in [    ], Pennsylvania after obtaining a purchase money mortgage in excess of $42,000 from [C] Savings and Loan. This was secured as a first mortgage on the premises.

(5) Around the time of [A's] death, respondent used information derived from [A] to convince [A] banker [D] at [E] Bank that he would assume the loan debt of [A's] and refer his clients to [E] if [E] would lend him $20,000, secured as a second mortgage, on the [B] residence.

(6) Between the summer of 1981 and January of 1982, respondent sought to purchase property at the shore.

(7) On or about January 13, 1982, respondent and his wife purchased a summer home in [F], New Jersey for the sum of $90,000 from [G], who agreed to take back $60,000 of that price as a five-year balloon mortgage.

(8) Respondent arranged for the incorporation of [H] Investment Inc. in New Jersey on or about January 28, 1982. Respondent was president and his wife was assistant secretary.

(9) Respondent organized [H] solely for the acquisition of the [F] property, which was the sole asset of [H].

(10) On or about February 1, 1982, respondent obtained a loan from [E] Bank for $50,000 secured by a mortgage against the [F] property. The stated purpose of the loan was to improve that property. Title was vested in the name of [H].

(11) Respondent used approximately $30,000 of the $50,000 mortgage loan for the down payment on the [F] property.

(12) [G] loaned [H] $60,000 and secured it with a mortgage.

(13) On April 1, 1982, respondent obtained an additional $20,000 from [E] Bank, increasing the mortgage loan from that bank to $70,000, the stated purpose of which was to complete improvements to the [F] property. These mortgage loans carried an interest rate between 19 percent and 20 percent per year, two points over the prime interest rate at that time.

(14) In or about May of 1982, respondent and his wife applied for a mortgage loan in the amount of $105,000 from [I] Mortgage Service in order to finance the purchase of the [F] property from [H] for a total of $160,000.

(15) Respondent falsely represented on the mortgage application that the source of the purported $30,000 down payment came from his savings, that he operated a commercial law and real estate business at [    ] Avenue in [   ], New Jersey, and that his income was $100,000 per year.

"(a) The home at the above address was a shore home owned by [J] Esquire until approximately 1985.

"(b) Respondent used the shore home as a 'second office' from which to represent his clients who had matters in federal court in New Jersey."

(16) In support of the mortgage application, respondent prepared and submitted the following fraudulent documents:

"(a) a purchase and sale agreement dated March 1, 1982, for the purchase of the [F] property from [H] for $160,000, which fraudulently reflected a $30,000 down

payment and a (nonexistent) $25,000 mortgage taken back by [H], the purported seller;

"(b) a lease agreement dated May 1, 1982, which reflected that respondent's residence at [B] had been leased to his sister and brother-in-law for $500 per month for a two year term beginning on August 1, 1982; a document to which respondent signed his name;

"(c) a letter dated approximately June 16, 1982, purportedly signed by an attorney for [H] and stating that respondent deposited $30,000 with [H] to complete rehabilitation on the [F] property. The letter further stated that [H] agreed to take back a $25,000 mortgage to be subordinated to the first mortgage to be issued by [I] Mortgage Service;

"(d) a 1981 Federal Income Tax Return dated April 13, 1981, which reflected respondent's total income as $119,859, while the actual return which was forwarded by his accountant by letter dated June 24, 1982, thereafter filed with the Internal Revenue Service in January 1983, reflected total income of $39,799;

"(e) a financial statement purporting to contain a balance sheet dated June 30, 1982, reflecting an annual salary of $100,000 and income taxes settled through December 31, 1981;

"(f) a profit and loss statement reflecting gross income of $93,350 and net profit of $50,631 for the first six months of 1982;

"(g) a letter to [I] Mortgage Service in which respondent falsely represented that (1) the increase in his income as reflected on the fraudulent 1981 tax return and the profit and loss statement were from substantial legal fees

which he received; and, (2) that the $30,000 down payment on the [F] property was paid in cash upon request of the seller;

"(h) a mortgage subordination and modification agreement between [H], the [respondent and his wife] and [G] that (1) the balance owed [G] was 'approximately $25,000,' instead of $60,000; (2) the balance was being assumed by the purchasers, with monthly mortgage payments reduced to $375; and, (3) this debt was being subordinated to the $105,000 mortgage loan obtained from [I] Mortgage Service; and,

"(i) two premises affidavits, one on behalf of [H] and the other on behalf of the [respondent and his wife] each reflecting no encumbrances affecting title to the [F] property other than the mortgage to [G] shown on the title insurance commitment."

(17) Respondent's sister and brother-in-law were unaware of the counterfeit lease in which he used their names.

(18) On or about August 6, 1982, respondent prepared a corporate resolution, purportedly signed by [K] secretary for [H], certifying that [H] had resolved to sell the [F] property to respondent and his wife.

(19) Respondent also signed the name [K] to the agreement of sale dated March 1, 1982, the corporate resolution of August 6, 1982, and the modification agreement dated August 6, 1982.

(20) Respondent also signed the name [L] to the above modification agreement. In addition, he signed the name of [M], the assignee for [G], to the subordination and

modification agreement. He also forged the notary's signature on the deed.

(21) On August 11, 1982, respondent signed the following documents in connection with settlement on the [F] property:

"(a) three false affidavits reflecting no secondary financing or other outstanding obligations against the [F] property, and no change in his income as reported on the mortgage application;

"(b) an affidavit certifying that the total purchase price was $160,000 and that the first mortgage amount was $105,000, cash equity was $55,000, and that these certifications were given to induce the mortgage company or its assignee to make or purchase this mortgage;

"(c) a deed for the [F] property in the names of [K] and [L] the president and secretary, respectively of [H];

"(d) a mortgage note in the amount of $105,000 reflecting the debt to [I] Mortgage Service;

"(e) a mortgage proceeds check in the amount of $104,044.43, payable to [H] and in the name of [K]. Respondent deposited the check into one of his own bank accounts."

(22) [I] Mortgage Service subsequently sold the mortgage to [N] Mortgage Association, and it was eventually assigned to [O] Mortgage Company prior to September 1984.

(23) On March 29, 1983, respondent borrowed $40,000 from [P] for renovations to his office and the [F] property.

(24) From approximately July of 1981 to the time that [D] left [E] Bank, around January 1, 1983, respondent borrowed approximately $300,000 on his line of credit

from [E] Bank. Respondent was able to obtain such money in part by giving [E] Bank a third mortgage on the [F] property. Furthermore, respondent persuaded [D] to make these uncollateralized loans by misrepresenting that his legal practice would generate sufficient fees to repay the loans.

(25) After [D] left [E] Bank to work at [Q] Bank, respondent used the shore home as partial security to obtain loans from [D] on a line of credit from [Q] and falsely represented that [Q] would be receiving a "third mortgage" on the [F] property.

(26) In July of 1983, respondent borrowed $65,000 from [Q] to renovate and remodel his new office to which he moved in either December of 1981 or 1982. [J] co-signed this note.

(27) Respondent's gross income for the years 1982 though 1984 was approximately $157,852; $177,543; and $281,582, respectively.

(28) Due to the soaring interest rates in 1982, respondent was able to make interest payments only on the mortgage held by [I] Mortgage Service. Respondent also began experiencing difficulty in collecting fees from some clients who were suffering economic difficulties.

(29) Respondent failed to make the monthly mortgage payments on the [F] property starting in August of 1983.

(30) Checks from respondent's office were bouncing on a regular basis in the months before respondent filed a bankruptcy petition.

(31) In the spring of 1984, [E] Bank threatened to foreclose on respondent's [B] and [F] properties unless respondent could obtain additional financing from [Q].

However, when bank regulators from the comptroller's office became involved with [Q's] operation, respondent feared that [Q] would also file a foreclosure action against the properties, so he informed [E] that he could not obtain additional financing from [Q].

(32) Therefore, in May or June of 1984, [E] initiated foreclosure proceedings on the two properties.

(33) In or about December of 1984, respondent received a fee of $250,000 for his representation of [R]. He received some of the money prior to filing the bankruptcy petition.

(34) On or about August or early September of 1984, respondent held conferences with two friends and clients, [S] and [T] of which the following took place:

"(a) Respondent told them of his intention to file a bankruptcy petition, which would temporary stay the foreclosure action;

"(b) Knowing that [E's] Bank's lien on the [B] property would be worth only $30,000 and that its third mortgage on the [F] property would be worthless in a legitimate bankruptcy proceeding, respondent asked [S] to lend him between $50,000 and $75,000, which respondent believed would be more than sufficient to persuade [E] Bank to extinguish or assign the debt and finally to withdraw its foreclosure action against the [F] property.

"(c) Respondent said that he would also use the bankruptcy petition to gain leverage to negotiate settlements with the secured creditors.

"(d) Respondent asked for the assistance of his clients in carrying out his scheme. [S] replied that he would replace both houses if respondent lost them.

"(e) [S] told respondent to purchase real estate and to title it so that [S] would have a life interest and the remainder would pass to respondent's children."

(35) [S] gave respondent an amount in excess of $250,000 in exchange for a $250,000 mortgage on the [F] property.

(36) [T], the other client, referred respondent to bankruptcy attorney, [U], who attempted to negotiate the [E] Bank debt or work out a repayment schedule, but [E] Bank refused to deviate from the terms of the original loan agreement.

(37) [U] advised respondent that unless he filed a bankruptcy petition or obtained the money to pay off [E] Bank's loan, respondent would lose one or both of his houses.

(38) Respondent failed to tell [U] about the $250,000 fee for representing [R].

(39) When respondent became delinquent in his repayment of the $65,000 loan to [Q] Bank, [J] opened an account at [V] Savings and Loan on September 10, 1984, with a $1,000 deposit; afterward, [J] deposited a portion of the legal fees jointly owned by him and respondent into the account, with [J] holding the fees as escrow agent for respondent, the named escrowee.

(40) On or about October 1, 1984, respondent filed his voluntary bankruptcy petition (under the usual penalty for perjury), in the United States Bankruptcy Court in New Jersey, using his [F] address and attesting New Jersey to be his state of residence. The New Jersey address was used in order to avoid adverse publicity in [    ] where he practiced law.

(41) Respondent listed a total debt of $591,245.28 to secured creditors and $45,910.44 to unsecured creditors.

(42) Respondent's bankruptcy petition, together with accompanying schedules and statement of affairs, was false in the following respects:

"(a) The [G] mortgage debt was listed at $25,000, rather than $60,000;

"(b) '[W]' was listed as a secured creditor instead of [G]; and a non-existent address for her was provided;

"(c) Respondent used the repeated $25,000 figure above and described this debt as a second mortgage incurred in October of 1993.

"(d) Respondent failed to list his checking account, which was opened with a $5,000 deposit on September 13, 1984, at [X] Bank;

"(e) Respondent failed to list his [V] Savings and Loan account, which was opened with a $1,000 deposit and into which was deposited respondent's share of the joint fees;

"(f) Respondent listed a $6,000 claim by the Internal Revenue Service 'for 1983' when in fact respondent's $6,000 check for payment of his 1981 federal income tax liability had been returned for insufficient funds, and respondent failed to file his income tax returns for 1982 and 1983;

"(g) Respondent did not list [E] Bank's mortgage on the [F] property;

"(h) Respondent listed [Q] Bank as holding a 'third mortgage' on the [F] property; and,

"(i) Respondent failed to list various unsecured creditors."

(43) On October 11, 1984, respondent provided his client [T], with $50,000 cash to purchase, at a discount respondent's debt of approximately $149,000 owed to [E] Bank, representing the combined balance of three business loans and overdrafts.

(44) [T] offered to raise the money to buy the mortgage from [E] Bank, which caused [E] Bank to agree to compromise respondent's debt for $44,000.

(45) On or about October 16, 1984, respondent received the operating guidelines and reporting requirements which required monthly reports of respondent's income and disbursements to be made to the office of the United States trustee.

(46) Respondent failed to report to the United States trustee giving [T] $50,000 as required by the operating guidelines and also the receipt of his fee from [R].

(47) Respondent kept approximately one-half of the [R] fee in cash at his house and deposited the balance into bank accounts.

(48) On October 25, 1984, respondent opened another account at [X] Bank and after several deposits the balance in that account, as of December 21, 1984, was approximately $116,000.

(49) Without notifying [E] Bank, respondent gave $4,000 in cash to a friend, [Y], on December 17, 1984, to purchase, at a discount, a separate $10,000 [E] Bank loan for [Z] equipment. Respondent also failed to report this transfer to the United States trustee.

(50) Between September of 1984 and March of 1985, respondent lent at least $60,000 to [AA], a former client

and close personal friend. The loan was advanced with a check for $35,000 and the balance in cash.

(51) Between September of 1984 and November of 1985, respondent made a loan of at least $50,000 to [T] using the same procedure.

(52) Between March of 1985 and June of 1985, respondent loaned $26,800 to another friend, [BB].

(53) Respondent failed to notify the United States trustee and his creditors about the above loans.

(54) At the December 21, 1984, bankruptcy deposition, respondent falsely testified, under oath, that:

"(a) the [E] Bank debt was now owed to his client, [T], and concealed his funding of the purchase, and the fact that it was really extinguished;

"(b) that his financial position had not changed nor the information in his bankruptcy petition and schedules when, in fact, respondent received the $250,000 [R] fee in the previous three months;

"(c) that [J] had been making all of the payments on a joint $60,000 business loan when, in fact, the payments were being made from the savings account at [V] Savings and Loan, which respondent failed to disclose at the bankruptcy proceeding;

"(d) that '[W]' held the mortgage on the [F] property;

"(e) that his employer's tax liabilities had been paid for the first three quarters of 1984 and are always current; when, in fact, respondent had been delinquent in filing and paying those taxes since the first quarter of 1982; and,

"(f) that he did not anticipate owing any significant amount of taxes at the end of 1984 and that his taxes

had been paid on a current basis, even though respondent had recently received the [R] fee and failed to file tax returns for 1982 and 1983."

(55) Between January 17 and 21, 1985, respondent opened two trust accounts for his children at [CC] Securities for a total of $51,273.33 and funded by [R] monies which had been deposited into the [X] Bank account.

(56) In February and March of 1985, respondent invested approximately $41,392.20 in a business venture to establish an airport limousine service to be known as [DD] Transportation. Respondent failed to report this venture to the United States trustee. However, the venture failed.

(57) On September 11, 1985, respondent opened a bank account in the corporate name of [EE] Inc.

(58) In November of 1985, $75,000 of the [AA] and [T] loans were repaid and respondent deposited the money into the [EE] account. He also failed to report receipt of this amount to the United States trustee.

(59) In November and December of 1985, respondent withdrew $75,000 from the [EE] account, making seven $9,700 transactions and one $7,100 transaction. Respondent failed to notify the United States trustee of these transactions.

(60) During 1985, respondent contacted a builder and arranged for the building and purchase of a new house at [FF], which was intended as a primary residence for him and his family. The cost of the home was approximately $180,000. Respondent also failed to report this construction to the United States trustee.

(61) By February 22, 1985, respondent had placed $1,500 in escrow with a realty company in case a building lot became available for the new home he wished to build.

(62) [S] provided respondent with a check for $150,000 towards settlement on the [FF] residence, and took a $250,000 mortgage on the property.

(63) Respondent was present at the settlement and titled the home in the name of [GG] Corporation. He left the settlement table with a check for more than $19,000, the proceeds of which he used to buy furniture for his new home.

(64) Respondent was president of [GG] Corporation and [S] held its stock in trust for respondent's children.

(65) Between February of 1985 and January of 1986, respondent spent between $30,000 and $60,000 of his own money on construction and furnishing his new home.

(66) During the pendency of the bankruptcy proceedings, the United States trustee filed a notice of motion for change of venue to change the location to [    ], based in part that respondent and his family were domiciled in Pennsylvania.

(67) In response, respondent submitted an affidavit, dated November 26, 1985, attesting that, following the contemplated sale of his [B] residence, respondent would own only the real estate located in [F], New Jersey. Respondent's home in [FF] was completed within two months of submission of the affidavit.

(68) In June of 1985, respondent obtained two loans for office equipment, which totalled approximately $31,000. This debt was compromised and assigned by

the [HH] Bank of [    ] to respondent's office partners, who benefited from the purchase.

(69) By October of 1985, respondent's outstanding 1981 federal income tax liability (with penalties and interest) had grown to approximately $10,000.

(70) Respondent wrote to his accountant, [II], on October 15, 1985. Respondent directed him to enter negotiations with the Internal Revenue Service and the City of [    ] concerning unpaid taxes. The letter stated:

"The negotiating points with the city are how far down the line they are with respect to lien priority. In other words, the house is only worth $77,000, but there is a first mortgage to [C] Savings Bank in the amount of $40,000 and a mortgage to [E] Bank in the amount of $150,000. Lastly, do not forget the fact that I am involved in a bankruptcy proceeding."

(71) The above representation of the [E] mortgage was false because that loan had been purchased by [T] in October of 1984.

(72) As a result of the bankruptcy proceeding, respondent's bankruptcy attorney mailed a motion to dismiss to the Internal Revenue Service and [HH] Bank of [    ] on November 27, 1985, and an order to the Internal Revenue Service and [E] Bank on December 10, 1985.

(73) The Bankruptcy Court placed two hearing notices pertaining to respondent in the U.S. mails, one to [HH] Bank of [    ] and the other to [E] Bank on December 19, 1985.

(74) By the first meeting of respondent's creditors in December of 1984, respondent had only two remaining secured creditors: [Q] Bank and [HH] Bank. The debts

of the eight other secured creditors listed in the bankruptcy petition had been either satisfied or compromised by his attorney, [U]. His client, [S], purchased the [G] purchase money mortgage and initiated foreclosure proceedings against the [F] property.

(75) In December of 1985, respondent filed a motion to withdraw his bankruptcy petition, and it was dismissed without prejudice by order dated January 7, 1986.

(76) When respondent was questioned by federal agents prior to December of 1987, he denied filing the phony 1981 tax return.

(77) At a later date, respondent admitted to preparing a false return, and to forging the signatures of his wife and accountant on the form.

(78) During the calendar year 1981, respondent received taxable income of approximately $33,451, on which respondent owed an income tax of approximately $5,743 and a self-employment tax of approximately $2,762. This total was reduced by an investment tax credit of $2,741 for a net tax of $5,764.

(79) Respondent paid $278 to the Internal Revenue Service as an estimated tax payment.

(80) Respondent filed an application for an extension of time in which to file his personal income tax return for 1981, which was accompanied by an additional tax payment of $290. However, the Internal Revenue Service denied this application because it was partially completed.

(81) By cover letter dated June 24, 1982, [II] returned respondent's 1981 tax returns, advising respondent that he could not obtain the information needed to complete the returns and recommended that respondent make ad-

justments to facilitate the orderly filing of returns. In addition, he provided a list of suggestions for maintaining orderly business records, and opined that respondent's large withdrawals were questionable and could spark an Internal Revenue Service investigation.

(82) On January 21, 1983, respondent filed a Joint U.S. Individual Income Tax Return, Form 1040, on behalf of himself and his wife, wherein respondent reported joint taxable income for calendar year 1981 as $33,451 with tax due in the amount of $5,764. Respondent sent a $6,000 check along with this return, which was returned due to insufficient funds.

(83) Respondent filed the 1981 return only after the Internal Revenue Service sent him a second inquiry letter on January 10, 1983.

(84) In the early 1980s, respondent owned restricted securities which had a value of approximately $65,000.

(85) Respondent spent approximately $73,000 in 1983 and $18,000 in 1984 to renovate his offices.

(86) In March of 1984, respondent borrowed an additional $60,000 from [Q] Bank: $20,000 for cost overruns on office renovations and $40,000 for funds needed until he collected fees.

(87) Respondent told an Internal Revenue Service agent that he could not explain his failure to satisfy his tax liability in 1983 while borrowing large amounts of money for other pursuits.

(88) On September 12, 1983, an Internal Revenue Service agent contacted respondent concerning his 1981 tax liability; respondent said that he could not pay his tax liability or borrow to do so, but that he would make

every effort to appear at the offices of the Internal Revenue Service on September 14, 1983.

(89) Respondent failed to appear in the offices of the Internal Revenue Service on that date.

(90) On January 31, 1984, respondent met with a revenue officer and represented that he would pay his 1981 tax liability in full by April 15, 1984, by making $2,000 payments on February 15 and March 15, and paying the balance on April 15.

(91) Respondent failed to make these payments.

(92) The interest from two bank accounts that housed the [R] fee totalled nearly $16,000 in 1985.

(93) On July 30, 1984, respondent leased a 1984 Pontiac Trans Am at $394 per month; he paid $9,000 on the lease through June of 1986.

(94) Then on July 15, 1986, respondent traded the Trans Am and purchased a 1987 Trans Am and 1987 Safari Wagon, paying $41,922 between August 4, 1986 and March 11, 1987.

(95) During 1984, respondent filed two applications for extension of time in which to file his tax return for calendar year 1983, initially extending the time until August 15, 1984, and later extending the time until October 15, 1984.

(96) Respondent only filed income tax returns for the calendar years of 1982 through 1984 in 1986 and 1987, after the commencement of the federal investigation.

(97) As an employer, respondent was required to file quarterly federal tax returns and to pay the applicable taxes.

(98) Respondent received his employer's quarterly federal tax returns for the first quarter of 1982 through the first quarter of 1984 from [II], but he failed to file them or pay the estimated taxes due to lack of funds.

(99) Respondent failed to file a timely employer's quarterly federal tax return for several quarters in 1983 and one in 1984 and nine consecutive employer's quarterly federal tax returns.

(100) Respondent's current tax liability is approximately $200,000. Since his release from prison, respondent has not made any substantial payments to reduce his tax liability.

(101) During the years in which the Internal Revenue Service was conducting its investigation, respondent refused to accept that he would be indicted. He did not seek psychiatric help until January of 1989.

(102) On July 6, 1989, respondent pled guilty to all 26 counts of an indictment by a federal grand jury for the United States District Court for the [    ] District of Pennsylvania in the matter of *United States of America v. [respondent],* criminal no. [    ].

(103) The indictment charged him with 14 counts of mail fraud, two counts of wire fraud, one count of transferring and concealing property of a bankruptcy estate, one count of willful failure to pay taxes, and eight counts of willful failure to file tax returns. He was also convicted of aiding and abetting in 16 of the previous counts.

(104) After his indictment, respondent suffered a mental breakdown that resulted in a 26-day hospitalization.

(105) On the day that respondent entered his guilty pleas, he filed a petition for immediate suspension with

the Supreme Court of Pennsylvania. In this petition, respondent alleged that he was suffering from psychological problems, was currently being medicated, and was under a psychiatrist's supervision.

(106) By order dated July 25, 1989, the Supreme Court of Pennsylvania granted respondent's petition for immediate suspension.

(107) However, respondent violated Disciplinary Enforcement Rule 6(1) of the United States Court of Appeals for the Third Circuit, which required that respondent notify the clerk of that court, within 10 days, of being convicted of a "serious crime."

(108) Respondent also failed to comply with Rule 14(II)(A) of the Rules of the United States District Court for the [    ] District of Pennsylvania, which required that respondent promptly inform the clerk of that court of the Pennsylvania Supreme Court order suspending respondent.

(109) Respondent was released from [JJ] Federal Prison Camp on or about December of 1990 after 10 months of incarceration.

(110) Two psychiatrists, [KK], M.D., and [LL], M.D., submitted testimony at the hearing through written reports.

(111) Dr. [KK] began treating respondent in January of 1989 and stated that respondent has been seriously and emotionally disturbed since childhood, and that it was as at the time of the purchase of the shore home that respondent began a series of bizarre acts extending over a three to four year period.

(112) Dr. [LL] evaluated respondent for the United States Probation Department and concluded that respon-

dent was narcissistic with borderline personality traits and that psychiatric treatment was appropriate for his symptoms.

(113) A third physician, [MM], M.D. gave live testimony at the hearing.

(114) Dr. [MM] testified, with a reasonable degree of medical certainty, that respondent had been suffering for many years from a mixed personality disorder not otherwise specified, which consisted of three types of personality disorders. He concluded that absent these personality disorders, it would be highly unlikely that respondent would have engaged in these kinds of criminal activities.

(115) After considering the psychiatric evidence, documentary evidence submitted by petitioner and respondent, and the testimony of witnesses, the Hearing Committee found that respondent was suffering from multiple personality disorders at the time he committed the illegal conduct at issue, and that these disorders constituted a substantial factor in causing his misconduct.

(116) Respondent admits that his conduct was unethical, illegal, and criminal.

(117) Respondent presented many witnesses, including friends, clients, and other attorneys, some of whom were formerly with the United States Attorney's Office.

(118) The Hearing Committee also found that respondent's misconduct did not involve his practice of law on behalf of any clients and did not injure any clients.

(119) In addition, respondent's diminished mental capacity from his multiple personality disorders constitutes grounds for consideration of mitigation of discipline, pur-

suant to the decisions of the Supreme Court of Pennsylvania in *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989); and, *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986).

(120) Respondent's prior disciplinary record consists of an informal admonition administered August 17, 1987.

## III. CONCLUSIONS OF LAW

The Hearing Committee found, and the Disciplinary Board agrees, that respondent's misconduct constitutes a violation of the following Disciplinary Rules:

(a) D.R. 1-102(A)(3)—which prohibits a lawyer from engaging in illegal conduct involving moral turpitude;

(b) D.R. 1-102(A)(4)—which prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;

(c) D.R. 1-102(A)(5)—which prohibits a lawyer from engaging in conduct that is prejudicial to the administration of justice; and,

(d) D.R. 1-102(A)(6)—which prohibits a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law.

## IV. DISCUSSION

Rule 214(e) Pa.R.D.E. specifies that a certificate of conviction of an attorney for a serious crime provides a per se basis for discipline. Hence, the only issue is the extent of discipline warranted by the conviction. *Office of Disciplinary Counsel v. Costigan,* 526 Pa. 16, 19, 584 A.2d 296, 298 (1990). The court must determine

whether the attorney's character renders him unfit to practice law. *Office of Disciplinary Counsel v. Casety,* 511 Pa. 177, 181, 512 A.2d 607, 609 (1986). The test balances a concern for the public welfare with a respect for the substantial interest of an attorney in continuing his involvement in the practice of law. *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 527, 426 A.2d 1138, 1142 (1981).

Each disciplinary matter is decided according to the totality of its facts. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983). In the instant case respondent was indicted and pled guilty to 29 counts which included mail fraud, failure to file tax returns, bankruptcy improprieties, along with aiding and abetting.

Respondent presented evidence in the form of psychiatric testimony, including live testimony by Dr. [MM], a renowned psychiatrist. Dr. [MM] is presently a clinical professor of psychology at the University of [    ] and has testified as an expert in many federal and state proceedings over the past 30 years. As part of his examination, Dr. [MM] reviewed the prior reports of Dr. [KK], who was respondent's treating psychiatrist, and Dr. [LL], who examined respondent at the United States Probation Department. Dr. [MM] testified, with a reasonable degree of medical certainty, that respondent has been suffering, for many years, from a mixed personality disorder not otherwise specified, which consists of three types of different personality disorders. The most prominent disorder is the narcissistic personality disorder; the second, an obsessive, compulsive personality disorder; and, the third, a paranoid personality. Dr. [MM] concluded that absent

these personality disorders, it would be highly unlikely that these kinds of criminal activities would have been engaged in by respondent. The Hearing Committee found the testimony of Dr. [MM] to be credible and persuasive and noted the lack of any contradictory expert testimony offered by petitioner.

In determining the appropriate sanction which should be imposed, the primary question is whether the record supports the finding that respondent's psychiatric condition was a factor in causing the misconduct. *Office of Disciplinary Counsel v. Braun, supra.* Psychiatric disorder is an appropriate consideration as a mitigating factor in a disciplinary proceeding and, in this case, the psychiatric disorder persuades the board to impose a sanction less severe than disbarment. Respondent further presented many witnesses who testified strongly as to his high level of professional competence as a practicing attorney prior to his suspension. Respondent's witnesses included several attorneys who are or were with the United States Attorney's Office and who were involved in cases in which respondent was the opposing counsel. All testified as to high level of professional competence.

The unanimous decision by the Hearing Committee that respondent should receive a five-year suspension is equally supported by the Disciplinary Board. Suspension and disbarment are the most severe types of discipline which can be imposed for attorney misconduct. See *Office of Disciplinary Counsel v. Keller, supra.* The deciding factor is the breach of trust involved. *Id.* Suspension requires withdrawal from the practice of law for a term not greater than five years. *Id.* At the end of the term

of suspension, the attorney may be reinstated immediately upon demonstration of the fitnesss to practice law. *Id.* On the other hand, an attorney who is disbarred must wait for a period of at least five years before applying for reinstatement. *Id.* The Disciplinary Board's decision to suspend respondent rather than disbar him is based upon the conclusion that respondent's personality disorders were a causal factor in the misconduct; and the numerous distinguished character witnesses who testified to his good character, high repute, and fitness to practice law, notwithstanding his conviction. See *Office of Disciplinary Counsel v. Eilberg,* 497 Pa. 388, 441 A.2d 1193 (1982).

Two cases involving isolated, but similar, facts support a recommendation of suspension over disbarment. In the first case, the respondent failed to file timely federal income tax returns and was found guilty in a federal court for willful intent. The board balanced this adverse effect on respondent's fitness to practice law with evidence of mitigating circumstances which resulted in a suspension. *In re Anonymous No. 108 D.B. 89,* 7 D.&C.4th 361 (1990). In the second case, the respondent was convicted for mail fraud in a federal district court, but failed to report his conviction. However, the board determined that his role was a minor one in a scheme to defraud clients and imposed a four-year suspension. *In re Anonymous No. 17 D.B. 87,* 50 D.&C.3d 287 (1988).

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent, [　　],

be suspended from the practice of law for a period of five years, retroactive to July 25, 1989.

It is further recommended that the court direct that respondent pay all of the necessary expenses incurred in the investigation and processing of this matter pursuant to Rule 208(g), Pa.R.D.E.

Ms. Flaherty and Mr. Kerns did not participate in the adjudication.

## ORDER

And now April 28, 1994, upon consideration of the report and recommendations of the Disciplinary Board dated October 28, 1993, it is hereby ordered that [respondent] be and he is suspended from the bar of this Commonwealth for a period of five years, retroactive to July 25, 1989, and he shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Messrs. Justice Papadakos and Cappy dissent and would issue a rule to show cause why respondent should not be disbarred.

Mr. Justice Frank J. Montemuro is sitting by designation as Senior Justice pursuant to Judicial Assignment Docket no. 94 R1800, due to the unavailability of Mr. Justice Rolf Larsen, see no. 127 Judicial Administration Docket no. 1, filed October 28, 1993.